IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANGELA F. AMOS,                           )

        Plaintiff,                    )   CIVIL ACTION NO.

v.                                        )    09-00817-CB-M

MOBILE COUNTY HEALTH                      )
DEPARTMENT,
                                          )
        Defendant.
                                          )

## OPINION and ORDER

This matter is before the Court on a motion for summary judgment filed by the

Defendant, Mobile County Health Department.  At issue is whether the Plaintiff, Angela Amos,

can adduce sufficient evidence to support her employment discrimination and retaliation claims.

After due consideration of the briefs and supporting evidence filed by the parties in light of the

applicable law, the Court finds that the motion for summary judgment is due to be granted.

### FINDINGS OF FACT

*The Parties*

Plaintiff Angela Amos is an African American female.  She obtained a B.S. in Pharmacy

from Xavier University in 1993 and is a licensed pharmacist.  From January 2005 until June 30,

2008, Amos worked with the Mobile County Health Department (MCHD)--first as a full-time

pharmacist and later as Pharmacy Director.  MCHD is the administrative agency for the Mobile

County Board of Health, which functions under the State of Alabama Board of Health. MCHD

offers a wide range of healthcare services to Mobile County residents, primarily those who

cannot afford the full cost of healthcare.  MCHD's services include providing family healthcare

and medical treatment to "traditionally underserved: low income patients through its primary clinic in downtown Mobile and through nine outlying clinics located in small municipalities and rural areas in Mobile County. MCHD also offers discounted prescription medicines to these clinic patients through its downtown Pharmacy.[1] Mobile County Public Health officer Dr. Bernard Eichold is responsible for MCHD's wide range of healthcare, clinical and ancillary services. Clinical and ancillary services, such as pharmacy, x-ray and laboratory services, are provided under the authority of the federally-funded "Family Oriented Primary Health Care Governing Council" (the "Governing Council"), which consists of patients and consumers of MCHD's clinical services, community leaders and representatives of various healthcare providers. During Angela Amos' tenure as Pharmacy Director, Susan Stiegler (white female) was (and is) the Director of Family Health Clinical Services ("Clinical Director"), reporting both to the Governing Council and to Dr. Eichold. As Clinical Director, Stiegler manages all clinical and ancillary services, including the Pharmacy, and supervises some 160 employees providing these services. Stiegler also prepares the Governing Council's applications for the federal grants required to fund these services.[2]

***The Pharmacy's Financial Losses and Crises***

Unfortunately, during the 2-½ years before mid-April 2008, the MCHD Pharmacy operated at a substantial financial loss – from October 2005 through March 2008, the Pharmacy

---

[1] Before mid-April 2008, the downtown Pharmacy filled and delivered prescriptions to its outlying clinics so patients at these clinics would not be required to travel long distances to pick up prescriptions.

[2] MCHD has two other Directors, including Director of Administrative Services Vivian De Vivo (Hispanic female), who report directly to Dr. Eichold. De Vivo is responsible for administrative services, including finance, employee benefits and human resources. MCHD's Comptroller Paul Betros, Director of Human Resources Peggy Howat and Director of Insurance and Benefits Roy Acree report to De Vivo.

lost over $694,000.  Before Amos was hired as a staff Pharmacist in early 2005, the Pharmacy filled an average of 250 to 300 prescriptions each day.  By mid-April 2008, the Pharmacy filled an average of some 120 to 130 prescriptions each day.  During that time, Dr. Eichold, Director of Administrative Services De Vivo and Clinical Director Stiegler periodically discussed scaling back Pharmacy services from full time to part time or eliminating Pharmacy services altogether.[3]

When Stiegler became Clinical Director in September 2005, she was instructed to reduce the Pharmacy's operating deficits.  Over the next 2-½  years, she reduced costs, improve efficiency and decreased the deficit significantly--from approximately $386,000 in fiscal year 2005 to $14,348 during the first three months of 2008.  On April 15, 2008, however, the Pharmacy received a "cease and desist order" from the Alabama Board of Pharmacy ("BOP") directing the Pharmacy to stop the delivery of prescriptions of the outlying clinics for distribution to clinic patients.  Not only did the BOP's order impose a hardship on low-income patients in these outlying areas, who now would be required to travel significant distances to pick up prescriptions at the downtown Pharmacy, the order seriously affected the Pharmacy's financial viability to reducing the number of prescriptions issued by the Pharmacy by some 20% -- from an average of approximately 120 prescriptions per day to an average of some 96 prescriptions per day.  As discussed below, the BOP's order prompted MCHD to take immediate steps to address the serious financial and regulatory issues confronting the Pharmacy.

***Amos' Employment with MCHD***

---

[3] According to Dr. Eichold, the Pharmacy must be financially self-sustaining because the Governing Council is not required to maintain ancillary services such as the Pharmacy,  it does not receive additional federal funds for that purpose and, consequently, the Pharmacy's serious financial losses diverted needed funds from other clinical healthcare services.

Amos was hired as a full-time Staff Pharmacist in early 2005. At that time, the Pharmacy had two full-time Pharmacists - - Amos and Pharmacy Director Carol Parkinson (white female), who was Amos' immediate supervisor.[4] In June 2005, Pharmacy Director Parkinson submitted a written resignation,[5] and in mid-July 2005 MCHD retained Phillip Brown (white male) to replace Parkinson as the Pharmacy Director. Brown became Amos' immediate supervisor. Two months later in mid-September 2005, Stiegler was assigned as the Clinical Director, and she became Brown's immediate supervisor.[6] Brown continued as the Pharmacy Director until he resigned effective December 31, 2006.

Amos was required to schedule and to provide documentation for doctors' and physical therapists' appointments and for other absences related to an on-the-job knee injury she sustained in October 2005, an injury that persisted throughout her employment. Amos' absences were not counted against her. However, documentation was required under MCHD's established policies to support Amos' request for workers' compensation and medical benefits and an employee benefit available only for job-related injuries called "Injured With Pay" status, which afforded Amos time off with full pay without using her accumulated paid vacation or paid sick leave for

---

[4] When Amos was hired in early 2005, De Vivo was the Clinical Director with overall responsibility for the Pharmacy, and Pharmacy Director Parkinson report to Bureau Director David Legett, who, in turn, report to De Vivo. (De Vivo at 7-8; De Vivo Dec. ¶ 2).

[5] The parties disagree about the reasons for Parkinson's resignation, but those reasons are not relevant to this matter.

[6] When Stiegler became Clinical Director in mid-September 2005, Pharmacy Director Phillip Brown began reporting directly to Stiegler. Bureau Director Legett was reassigned, and De Vivo became the Director of Administrative Services. (De Vivo Dec. ¶ 3; De Vivo at 7-8; Stiegler at 12-14)

that purpose.[7]  Amos points to her predecessor, Phillip Brown, as a Pharmacy Director who did not have to document his absences.  Brown, however, did not have an on-the-job injury, and he never sought workers' compensation benefits or "Injured With Pay" leave.

After Brown resigned, Clinical Director Stiegler interviewed three other pharmacists.[8] On January 10, 2007, Stiegler recommended Amos for the full-time Pharmacy Director position. The Governing Council and Dr. Eichold approved Stiegler's recommendation, and Amos was promoted.  Like Phillip Brown, Amos was employed under a one-year contract captioned *Employment Contract - - Full-Time Director of Pharmacy*, with the proviso that either party could terminate the contract at any time by giving sixty days prior written notice of termination.[9] Due to the ongoing financial deficits in the Pharmacy, however, MCHD did not retain another full-time Pharmacist to replace Brown, and Amos became the only full-time Pharmacist.  In addition to Amos, the Pharmacy employed two Pharmacy Technicians and from time to time

---

[7] With only one exception, all documents in Amos' MCHD medical records file relate directly to her on-the-job injury and her requests for "Injured With Pay" leave.

[8] Amos testified that Stiegler interviewed three pharmacists in January 2007, presumably for the Pharmacy Director position.  Amos asserts that the position was first offered to a Caucasian female, but that is based on Plaintiff's unsupported inference from a hearsay testimony.  Amos testified that one of the interviewees, whose name she does not know, told Amos she had been offered the position.  That is clearly hearsay, and due to Plaintiff's inability to identify the declarant it is not likely to be reduced to admissible form at trial.  *Cf.* Fed. R. Civ. P. 56(c)(2) (evidence that cannot be reduced to admissible form at trial is basis does not create issue of fact).  Moreover, Amos' own recollection of the hearsay statement exemplifies why hearsay is inadmissible.  According to Amos, the woman interviewed with Stiegler and then came in to tour the pharmacy.  At that point "she told [Amos] she did not know if she wanted the position or not as the pharmacy director, because – and she said she had told Susan that she would think about it."  Pl.'s Depo. 188.  Noticeably absent is any statement that the job had actually been offered.  Moreover, Stiegler testified that she did not offer the position to anyone other than Amos.

[9] In January 2008, MCHD renewed Amos' employment contract as the full-time Pharmacy Director, with a pay increase of over $6,000 per year.

contracted with one or more "PRN" Pharmacist to work on-call as needed.  If Amos was absent from work and the PRN Pharmacist was not available, however, the Pharmacy had to close.

As Pharmacy Director, neither Brown nor Amos had the authority to hire Pharmacy Technicians.  In 2005, then-Pharmacy Director Brown interviewed two prospective Pharmacy Technicians at the direction of the then-Bureau Director David Leggett, who reported to then-Clinical Director De Vivo (not Stiegler).  Allowing Pharmacy Director Brown to conduct these interviews did not interfere with Pharmacy services because, at that time, there were two full-time Pharmacists in the Pharmacy.  When Stiegler promoted Amos to Pharmacy Director after Brown retired, Amos was the only full-time Pharmacist in the Pharmacy.  For that reason, Stiegler assumed a number of administrative duties previously performed by the Pharmacy Director, including interviewing the only Pharmacy Technician who was hired during Amos' tenure as Pharmacy Director.  To do otherwise may have required closing the Pharmacy if the PRN Pharmacist was not available.

During her tenure as Pharmacy Director, Amos admittedly had conflicts with her new supervisor, Clinical Director Stiegler.  Friction between the two was evident in email exchanges. A series of emails, in late January and early February 2008, began with Stiegler asking Amos to reschedule two doctors' appointments to minimize disruption of Pharmacy services and ended with Amos refusing to meet with Stiegler without a witness and each accusing the other of creating a hostile environment.[10]  As the independent investigator who investigated Amos' April

_____

[10] According to Amos, the "hostile environment" referred to three or four previous occasions during the past year when Stiegler "fussed" at her ("yelling" or "hollering").  Although Amos "felt" Stiegler was "treating [her] that way because [she] was a black female," she did not complain to anyone that Stiegler fussed at her or treated her differently because of her race or sex until she provided her April 22, 2008, written complaint alleging race (but not sex) discrimination.

22nd race discrimination complaint against Stiegler later concluded: "It is clear … Stiegler and Amos had a "strained relationship" and a "personality conflict."

A week later, Amos sought a meeting with Dr. Eichold to request reassignment to a different supervisor. Because Dr. Eichold was not available, Amos met with Director of Administrative Services De Vivo on February 12th and asked for a different supervisor because Stiegler was rude to her, chewed her out, and fussed and yelled at her. Amos did not suggest that her race or sex was the reason. De Vivo explained that the Pharmacy was required to be under Stiegler's supervision. Amos also complained to De Vivo that the Pharmacy was inadequately staffed, to which De Vivo responded that current staffing was sufficient to meet the workload. When De Vivo asked if there were any witnesses to Stiegler's alleged behavior, Amos stated that Stiegler's behavior toward her was different when there were witnesses present. Following the meeting De Vivo interviewed Stiegler about Amos' complaints. Stiegler denied Amos' allegations and attributed their difficulties to Amos' opposition to changes and cost-cutting measures implemented by Stiegler.

According to Amos, during her 15-month tenure as Pharmacy Director, Stiegler "fussed" at her on three or four occasions, including during the April 18th Pharmacy staff meeting that prompted Amos to complain to Human Resources. Amos variously described Stiegler's "fussing" as "raising the tone of her voice," "yelling" and "hollering". Indeed, Amos considered "fussing" and "raising her voice" to be the same as "yelling" and "hollering." Stiegler reportedly fussed at her on one occasion for taking time off from work for her work-related injury. Amos could not recall the reasons Stiegler fussed at her on any other occasion, except during the April 18th staff meeting, when Stiegler, in Amos' words, "verbally attacked" Amos about: (1) an unauthorized change in the procedures for securing and dispensing MCHD

employee prescriptions (which Amos had nothing to do with); (2) smiling when Stiegler discussed the impact of the BOP cease and desist order (3) Amos' failure to schedule a new Pharmacy Technician for annual training; and (4) Amos' failure to attend required healthcare provider staff meetings.

***MCHD Confronts Multiple Crises***

Difficulties in MCHD's pharmacy operations began to reach crisis level on April 15th, when MCHD received the BOP's "cease and desist" order requiring the Pharmacy to stop delivering prescriptions to the outlying clinics.[11]  That order threatened both MCHD's ability to serve patients in outlying areas and the financial viability of the entire Pharmacy operation. After Stiegler reviewed the order, she promptly e-mailed Amos, whose job duties included compliance with BOP regulations, and requested Amos' recommendation on immediate steps that could be taken to serve the patients in outlying areas.  Amos replied:  "My only recommendation is for us to abide by the law."  Stiegler and Amos later discussed whether MCHD could dispense patient prescriptions that already had been delivered to the outlying clinics.  Amos' recommendation:  return the prescriptions to the downtown Pharmacy and require patients at the outlying clinics to travel to the downtown Pharmacy to pick up their prescriptions.  Stiegler later conferred with a BOP representative and obtained permission to dispense these prescriptions from the outlying clinics.

Over the next few days, Stiegler conferred with Dr. Eichold and Director De Vivo to discuss steps that could be taken in the wake of the cease and desist order.  Dr. Eichold

---

[11] Several months before the cease and desist order, Amos had notified Stiegler that she believed it was illegal to dispense medicine at the outlying clinics.  Stiegler had been working with the Board of Pharmacy to determine whether its procedures were acceptable.  Because of those efforts, Stiegler was surprised when MCHD received the cease and desist order.

considered closing the Pharmacy or scaling back Pharmacy services to part-time, an option that had been discussed over the past several years. Dr. Eichold directed Dr. De Vivo to conduct an evaluation of the financial feasibility of continuing full-time Pharmacy services, and he directed Stiegler to notify the BOP promptly to request relief from the cease and desist order, which adversely affected patients' access to affordable medicines.[12]

In the midst of this crisis, the relationship between Amos and Stiegler reached a breaking point. Stiegler scheduled and conducted a special Pharmacy staff meeting in the Pharmacy on the morning of April 18th with Amos and the two Pharmacy Technicians to address important issues. The staff meeting, which lasted some 20 minutes, began on a contentious note when Stiegler first discovered a change in the procedure for securing and dispensing MCHD employee prescriptions without her knowledge or authorization.[13] Stiegler verbally attacked her and yelled out questions about the change, even though Amos was not in charge of dispensing employee medication. Stiegler yelled when she asked about Amos' scheduling employees to attend upcoming annual training. When Stiegler addressed MCHD's effort to seek a waiver from the BOP's "cease and desist order," Amos smiled, and Stiegler demanded to know what she was smiling about. Stiegler told Amos she did not find the cease and desist to be funny. Both agree that Amos then responded: "You want me to frown?" Next, Stiegler "went into a rage" about the location of the employee prescriptions, a matter for which Amos had no responsibility. At

---

[12] Dr. Eichold initially contemplated that MCHD could obtain a waiver on the BOP's prohibition on so-called "courier service" to the outlying clinics. Such was not the case. (Eichold at 39-42).

[13] MCHD provided employees with prescription medication as an employee benefit. Employee prescriptions were filled by a part-time Pharmacist who reported directly to Director De Vivo and were secured and dispensed in a different area, not in the Pharmacy. Inexplicably, the employee prescriptions had been removed from the separate secured area and placed in an unsecured box on Amos' desk in her office in the Pharmacy Department.

that point, Amos told Stiegler she was "sick" and "had to go to the doctor." Before leaving, Amos attempted to visit Dr. Eichold and De Vivo, both of whom were out of town. Amos then told several employees that she felt as if she needed to file a police report against Stiegler for harassment. Amos then left work and sent to a hospital emergency room for reported heart palpitations, anxiety and a panic attack.[14]

In the late afternoon on that same day, Amos telephoned Human Resources Director Peggy Howat and complained about Stiegler's alleged "verbal attack" during the morning staff meeting. Amos did not complain about discrimination or harassment because of race or sex. At the conclusion of the conversation, the H.R. Director Howat instructed Amos to provide a written Incident Report when she reported to work on Monday, April 21st, and she began an investigation of Amos' verbal complaint. Dr. Eichold received a brief telephone report on Amos' complaint and departure from work while he was out of town on April 18th and a more complete report when he returned on April 21st, including the facts that Amos reportedly went to an emergency room for anxiety and a panic attack and had threatened to file a police report against her supervisor.

On Monday, April 21st, Dr. Eichold held a staff meeting with Director De Vivo and Comptroller Paul Betros to address the financial impact of the BOP's cease and desist order on Pharmacy services. During the meeting, De Vivo provided a report concluding that, "given the circumstances as they stand, it is difficult to justify the operation of the Pharmacy on a full-time basis" and recommending the creation of a Pharmacy review team "to study different Pharmacy models [that] would help … achieve equity Pharmacy services to all patients at all [clinic] sites."

---

[14] Amos had been treated for "heart palpitations," "anxiety" and "panic attacks" long before, as well as during and after, her employment with MCHD, and she admittedly experiences "heart palpitations" in "stressful" situations.

At the conclusion of the meeting, Dr. Eichold made the decision to suspend full-time Pharmacy services pending further review and approval by the Governing Council.

Meanwhile, Dr. Eichold faced several more Pharmacy crises—the personnel problems involving Amos and Stiegler, Amos' continued absence, a surprise visit from the BOP and control of the Pharmacy key. The Pharmacy did not open as scheduled on April 21st, leaving patients without access to medicine for the second day.[15] Amos called in sick because she had taken a Xanax the day before and felt like the medicine was still in her system. The Pharmacy opened later on Monday after Ms. Stiegler was able to find a substitute pharmacist from the University of South Alabama School of Medicine to dispense prescriptions.[16] That afternoon an inspector from the BOP visited the Pharmacy and advised Dr. Eichold that the Board had received an anonymous tip that the Pharmacy was dispensing prescriptions without a pharmacist present. Amos admits she provided that tip. In the absence of the supervising pharmacist (Amos), Dr. Eichold had retrieved the spare key to the Pharmacy from a locked box in his office (a box that could be opened with a key Dr. Eichold kept) to enable the substitute pharmacist to open the Pharmacy and dispense prescriptions. The BOP inspector advised Dr. Eichold that this

---

[15] The Pharmacy was closed on Friday when Amos left work after the confrontation with Stiegler.

[16] The Pharmacy cannot be opened without a licensed Pharmacist present. The Alabama Board of Pharmacy requires all Pharmacies to have a "supervising pharmacist" registered with the Board. The "supervising pharmacist" has possession of and is solely responsible for the key to the Pharmacy. A substitute key may be kept in a box with a combination lock in a designated location. If the supervising pharmacist is absent, the supervising pharmacist must follow prescribed procedures to notify a substitute Pharmacist of the combination to the locked box to enable the substitute Pharmacist access the key to open the Pharmacy. Amos was the registered supervising pharmacist for the MCHD Pharmacy.

procedure (i.e., allowing Dr. Eichold access to the spare key) was not in compliance with BOP requirements, and Dr. Eichold agreed to correct the procedure.[17]

Early the following morning (April 22nd), Dr. Eichold telephoned William Justice, a retired career pharmacist with extensive pharmacy management experience (Mr. Justice had owned and managed a number of pharmacies in several different cities) and a former Chairman of the Alabama Board of Pharmacy, to seek Justice's assistance in addressing "the regulatory issues with the State Board of Pharmacy."  Justice agreed to meet with Dr. Eichold around 11:00 a.m. to noon that day.

At approximately 7:35 a.m. on April 22nd, Amos delivered her written complaint to the H.R. Director Howat recounting her verbal account of the April 18th staff meeting and, for the first time, complaining that Stiegler had subjected her to "racial discrimination."  (Amos at 331-37, Exhs. 41-42).  During an ensuing interview with the H.R. Director, Amos aired a spate of complaints against Stiegler, former Pharmacy Directors Carol Parkinson and Phillip Brown and current Director of Administrative Services De Vivo.[18]   At the conclusion of the interview, Amos told Howat, in essence, that she could not return to work for at least a week.[19]

---

[17] Confronted with Amos' continuing absence and uncertain status, Dr. Eichold initially sought to address the absence of a "supervising pharmacist" on April 21st by filing a form with the Alabama Board of Medical Examiners to register himself as the "dispensing physician" for all MCHD clinic patients, which would enable Dr. Eichold to dispense patients' prescriptions from the Pharmacy as a treating doctor, not as a Pharmacist.  Shortly thereafter, he concluded that serving as the "dispensing physician" for the Pharmacy, in addition to performing his duties as Mobile County Public Officer, was unworkable.

[18] MCHD has implemented, disseminated, enforced and trained all employees on Equal Employment Opportunity  and Harassment Policies that prohibit all forms of unlawful discrimination and harassment, including discrimination and harassment because of race and sex.  The policy includes a "complaint procedure" that affords any employee who believes he or she has been subjected to prohibited discrimination or harassment to complain directly to the Director of Human Resources, with review by Public Health Officer Eichold.  The policy explicitly prohibits "retaliation" against any employee who comes forward with a discrimination (Continued)

After completing the interview, HR Director Howat escorted Amos to the third floor library and asked her to wait for Dr. Eichold, who wanted to speak to her about her complaint. Dr. Eichold met with Amos briefly around 10:30 a.m.  Dr. Eichold told Amos he would investigate the situation and asked her wait while he took care of some things.  He told Amos that, if he was delayed, she could go to lunch and they would meet when she returned.[20]   Dr. Eichold then met with Justice, who agreed to serve as a Pharmacy Consultant and member of a Pharmacy Review Team to address the regulatory and financial issues confronting the Pharmacy.[21]  At that point, Dr. Eichold anticipated Amos would continue as the "supervising pharmacist" for the Pharmacy.  When Dr. Eichold returned to visit with Amos around 1:07 p.m., however, he was told Amos had left and had not returned.  At Dr. Eichold's request, Director H.R. Howat telephoned Amos on her cell phone - - Amos advised she had just driven into her driveway at home and "was sick, she felt she was being setup in some type of way and it was too much anxiety … fear of being setup … '[she was] trembling, having panic attack … [Didn't] want to risk driving"

---

or harassment complaint.  All MCHD employees, including Amos and Stiegler, were required to read and to comply with these policies.

[19] Amos said she needed to follow up with her doctors and that she could not function at work or drive while taking her anti-anxiety medication.

[20] At that point, Dr. Eichold knew Amos had submitted her written complaint which he understood to be a written account of her April 18th verbal complaint.  He did not know she had included a race discrimination allegation in her April 22nd complaint.

[21] Plaintiff disputes this statement, arguing that "Justice testified that he did not know what his role in the pharmacy would be at this point."  (Pl's Brf., Doc. 39, 4.)  This purported dispute is both immaterial and unsubstantiated.  Justice testified:  "I didn't have any expectations [about my role] *other than just being an interim pharmacist and just working until they could make some kind of resolution to their problem.*"  (Justice Dep., Doc. 38-6, 27.)  (Emphasis added.)

***Crises Resolved: Amos Placed on Administrative Leave, Amos' Complaint Investigated,
Pharmacy Reduced to Part-Time Operation***

Confronted with Amos' continuing absence, Dr. Eichold concluded that her availability

to continue as the supervising pharmacist was, at best, uncertain:

> Amos has now been out Friday and out Monday … Now, she
> comes to work on Tuesday, she's filed something [her
> April 22nd complaint].  I haven't seen what she's filed, and
> now she is out again.

(Eichold at 65).  Accordingly, Dr. Eichold made the unilateral decision to register Justice as the

"supervising pharmacist" so Justice would have control over the Pharmacy key and could insure

a Pharmacist was available to continue critical Pharmacy services.  Dr. Eichold met briefly with

Justice, who agreed to become the interim supervising pharmacist, as well as a Pharmacy

Consultant.  As Dr. Eichold explained, retaining Justice as the supervising pharmacist and as a

Pharmacy Consultant, did not place Justice in the position of Director of Pharmacy.[22]

Late on April 22nd, Dr. Eichold met with legal counsel Michael Murphy and made the

decision to place Amos on administrative leave *with* pay pending complaint of the investigation

of her April 18th verbal complaint.  Dr. Eichold made the decision[23] based on:  (1) the need to

insure a "supervising pharmacist" was onsite in light of Amos' continuance absence and her

uncertain availability; (2) uncertainty whether Amos could work effectively with Clinical

---

[22] Plaintiff disputes this entire paragraph, citing portions of Mr. Justice's deposition.  Pl.'s
Brf., Doc. 39, 4.  However, the cited deposition excerpts do not actually contradict these facts.
On April 25th, Dr. Eichold signed two Employment Contracts with Justice, who signed the
contracts on April 28th – One as the "***Interim*** Supervising Pharmacist" and one as the "Pharmacy
Consultant."  Both Employment Contracts were subject to termination by either party with 60-
day prior written notice.  (Justice at 27-29, PX 42; Eichold at 74, PX 42).

[23] Clinical Director Stiegler played no part in the decision or in the subsequent decision to
terminate Amos' contract as the full-time Pharmacy Director.  (Stiegler at 157-58; Eichold Dec.
¶ 15).

Director Stiegler during the investigation of her complaint, (3) lack of previous employee complaints about Stiegler, who supervised some 160 employees, many of whom are African-American females, and (4) Ms. Stiegler's ongoing role in addressing the financial and regulatory issues confronting the Pharmacy. That evening, Dr. Eichold telephoned Amos to advise she would be on administrative leave with pay during the investigation of her April 18th complaint, and she therefore was relieved of her responsibility as the "supervising pharmacist." Amos did not object, and she gave no indication when she would be ready or able to return to work. At Amos' request, Dr. Eichold provided Amos written notice of the decision.

Later that same evening (April 22nd), Dr. Eichold met with legal counsel Michael Murphy and Director De Vivo, who briefed Dr. Eichold on Amos' April 22nd written complaint alleging race discrimination. After consultation with legal counsel, Dr. Eichold decided to retain outside legal counsel to conduct an independent investigation of Amos' race discrimination complaint. Dr. Eichold retained attorney Mary Pilcher, whose firm specialized in representing employees in discrimination lawsuits, to conduct the investigation.

A week later on April 29th, the Executive Committee of the Governing Council was presented with a summary of a financial analysis of Pharmacy operations compiled by Comptroller Paul Betros, and the Committee unanimously recommended that Pharmacy services be changed from *full-time* to *part-time*. The recommendation was provided to Director of Administration Services De Vivo, who met with Dr. Eichold the following day (April 30th). During the meeting, De Vivo provided Dr. Eichold with a memorandum describing her evaluation and recommendation, together with a copy of Betros' financial analysis. After recounting the ongoing financial issues confronting the Pharmacy, De Vivo's memorandum

concluded that the number of prescriptions filled did not warrant continuation of full-time pharmacy services.

Based on the financial analyses and recommendations, as well as his own knowledge and evaluation of the financial and regulatory issues confronting the Pharmacy, Dr. Eichold made the decision to continue Pharmacy service on a part-time rather than a full-time basis. Consequently, Dr. Eichold concluded that retaining a full-time Pharmacy Director with full-time pay and employee benefits was not financially prudent and was unnecessary in light of the decision to provide only part-time Pharmacy services three days each week. Accordingly, Dr. Eichold provided Amos the requisite 60-day written notice of the termination of her employment contract as the "full-time" Pharmacy Director effective June 30th. The notice also advised Amos that her race discrimination complaint was under review by outside legal counsel and that she would remain on paid administrative leave pending further notice. In the interim, Mr. Justice and a Pharmacy Review Team had been asked to conduct a comprehensive review and evaluation of all Pharmacy operations to address the Pharmacy's regulatory and financial issues.

Shortly thereafter in early May 2008, Amos filed her EEOC charge alleging some of the same race and sex discrimination and retaliation claims she included in her lawsuit complaint. After MCHD received Amos' EEOC charge in early May, Dr. Eichold requested independent investigator Pilcher to expand her investigation to include Amos' retaliation claim. On June 16th, Pilcher submitted her *Investigation Report* and *Summary of Findings* finding that Amos' claims were unfounded.

On June 19th, Dr. Eichold notified Amos of the results of the independent investigation. After briefly summarizing the investigator's findings, Dr. Eichold's further advised:

> Our Pharmacy program has undergone dynamic review for
> several years, and we have implemented a number of

> changes to respond to the Pharmacy's unacceptable
> financial losses … Currently, a part-time Pharmacy is all
> MCHD can justify. **As an interim measure**, we have
> retained a past Chair of the Alabama State Board of
> Pharmacy to act as the **Interim** Supervising Pharmacist and
> as a Consultant for our Performance Review Team to ensure
> full compliance with all regulatory requirements.

(Amos at 361, Exh. 45) (emphasis added). Amos was authorized to remain on administrative leave with pay through June 30th, i.e., the effective date of the end of her contract as the full-time Pharmacy Director.

Dr. Eichold's decision to terminate Amos' contract as the full-time Pharmacy Director did not foreclose hiring Amos as a part-time pharmacist or as the part-time "supervising pharmacist" at some point (with or without the title of Pharmacy Director). At that time, Dr. Eichold did not have a firm plan on the regular staffing of the Pharmacy after completion of the ongoing evaluation of Pharmacy services was completed. [24] On June 27th (shortly before the effective date of the end of Amos' contract), Dr. Eichold wrote Amos as follows:

> [MCHD] currently cannot financially justify providing full-time
> Pharmacy services under the supervision of a full-time
> Supervising Pharmacist … The Pharmacy is operating 24
> hours each week and is meeting out patients' current needs.
> The **interim part-time** Supervising Pharmacist/Consultant is
> continuing to work with the Board of Pharmacy in an effort to
> achieve relief from the recent cease and desist order. **He
> also is consulting with our management team and our
> Pharmacy Performance Review team on ways to
> increase efficiency and productivity.** Our [Clinical Director],
> Susan Stiegler continues to supervise the Pharmacy and the
> Family Oriented Primary Health Care Governing Council
> that approves the Pharmacy services that we provide. We do not

---

[24] Notwithstanding Amos' knowledge that her full-time employment contract was coming to an end, and her acknowledged receipt of the written notice advising her that Pharmacy services had been changed to part-time and that, as an "interim measure," MCHD had retained an "interim" supervising pharmacist," Amos never contacted MCHD to advise she was ready or willing to return to work in a part-time position.

anticipate any changes in this structure.

**If you would like to apply for a part-time Pharmacist position, we will be glad to consider your application. If selected, you would be required to work cooperatively and effectively with the director, Susan Stiegler. We anticipate that the resumes and applications we receive for part-time Pharmacists will be a resource for filling the part-time Director of Pharmacy position when we complete our review of Pharmacy operations.**

As you approach the end of your full-time Employment Contract with [MCHD], please do not hesitate to call the Human Resources Department to answer any questions.

(PX 11) (emphasis added).

Amos never responded, and she never contacted MCHD to express any interest in a part-time position. In deposition, she testified she did not receive the letter, which was mailed to her correct address in an envelope with the MCHD"s complete return address. The letter was never returned to MCHD as undeliverable.[25] Dr. Eichold had no reason to believe that Amos did not receive his letter, and he concluded that Amos was not interested in a part-time position.

## CONCLUSION OF LAW

In this action Plaintiff has asserted two distinct claims: (1) discrimination based on race and sex and (2) retaliation. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* prohibits employers from discriminating "against any individual with respect to his

---

[25] Plaintiff implies that she did not receive the letter because the zip code was wrong. Even if that were true, it does not dispute Dr. Eichold's reasonable *belief* that Amos had received the letter and was not interested in the job. Moreover, there is no evidence that the zip code *on the envelope* was wrong. Plaintiff bases her assertion on the *omission* of any zip code from Plaintiff's address in the caption of the letter. We know this because a copy of the letter was retained in MCHD's file. There is, however, simply no way of knowing whether the envelope in which the original letter was mailed bore the correct zip code, the wrong zip code or no zip code at all.

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Under Title VII it is also unlawful for an employer to retaliate against an employee "because [the employee] has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII]." 42 U.S.C. § 2000e-3(a).  Below the Court reviews, briefly, the applicable legal standards--both the standard governing summary judgment motions and the framework applied to Title VII discrimination and retaliation claims--before examining the issues raised on summary judgment.

### *Legal Standards*

#### *Summary Judgment*

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact.  *Id*.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)) (footnote omitted).   "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of

the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).

The factual disputes raised by the nonmoving party must be both *material and genuine*. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "'Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993)).[26]

*Title VII Framework*

When a plaintiff relies on circumstantial evidence to support a disparate treatment claim under Title VII—whether the claim is based on sex discrimination, race discrimination or

---

[26]The method for supporting or disputing facts on summary judgment is set out explicitly in the newly-amended Fed. R. Civ. P. 56(c):

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> (2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

retaliation—the evidence is evaluated using the "shifting burdens" analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1375 (11th Cir. 1996) (discrimination); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (retaliation). "To prove discriminatory treatment through circumstantial evidence: (1) a plaintiff must first make out a prima facie case, (2) then the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the adverse employment action, and (3) then the burden shifts back to the plaintiff to establish that these reasons are pretextual." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1375 (11th Cir. 1996) (internal citations omitted).

***Plaintiff's Discrimination Claims***

Amos alleges the following acts of discrimination in her complaint:

> After the plaintiff assumed the position of Director, she was treated differently than the previous Caucasian directors. The plaintiff was required to give an example of sick time requested along with time for each appointment. . . . Also, the plaintiff was not aware of or involved in the hiring of pharmacy technicians, even though past Caucasian Directors had direct involvement in this process.
>
> The plaintiff was also yelled at and spoken to very harshly by Stiegler, which was different than her treatment of past Caucasian Directors.

Compl., Doc. 1, ¶¶ 9, 10. To satisfy her burden of proving a prima facie case of discrimination, Amos must prove, among other things that she "suffered an adverse employment action" and that she "was ... treated less favorably than a similarly-situated individual outside h[er] protected class." *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). MCHD argues that Plaintiff cannot meet her burden with respect to these elements. Below, the Court examines each

claim for the existence of an adverse employment action before turning, briefly, to the search for a similarly-situated comparator.

None of the actions complained of—requiring Amos to document her leave requests, failing to involve Amos in hiring decisions or subjecting Amos to a supervisor who yelled at her—amount to an adverse employment action.  When a claim is based on Title VII's anti-discrimination provision, the adverse employment action element requires proof of a "serious and material change in the terms, conditions or privileges or employment." *Davis v. Town of Lake Park,* 245 F.3d 1242, 1239 (11th Cir. 2001).  This means "[an] ultimate employment decision or . . . some other showing of substantiality in the employment context." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (internal quotation omitted).

Amos never  explains why scheduling absences or interviewing prospective employees could be considered adverse employment actions.  Instead, she diverges to relate them to *other* events that she considers adverse employment actions.  First, Amos argues that she had to work when she was sick (not a claim previously asserted) or had to "jump through extra hoops to gain time off"[27] because MCHD did not provide her with the same staffing as the previous Pharmacist.  Pl.'s Brf., Doc. 39, 28.  Thus, rather than explain why scheduling time for absences could be considered an adverse employment action, Plaintiff has inserted a new instance of inequitable treatment, i.e., that  she had no full-time pharmacist to assist her.  Following Amos' logic, the claim asserted in the complaint (scheduling time for absences) is the *result* of

---

[27] This claim is belied by MCHD's *uncontradicted* testimony that Amos' was required to document her absences related to her on-the-job injury due to worker's compensation requirements.

an unasserted adverse employment action (inadequate staffing), not the adverse employment action itself.[28]

Amos' attempt to frame the inability to interview prospective employees as an adverse employment action is even more tenuous.  Plaintiff leaps from "the fact that she was constantly berated by Stiegler and not allowed to participate in the decision making process" to the conclusion that "such treatment was adverse."  Hyperbole aside, the *claim* is simply that Amos was unable to interview prospective employees.  There is no evidence to suggest that this had an substantial effect on her employment.  Similar efforts to elevate workplace tribulations to Title VII claims have stumbled on the adverse employment action hurdle.  *See, e.g., White v. Hall*, 389 Fed.Appx. 956 (11th Cir. 2010) (more difficult assignments and less favorable evaluations not adverse); *Miller-Goodwin v. City of Panama City Beach*, 385 Fed. Appx. 966 (11th Cir. 2010 (ignored at party, not told of event cancellation and accused of making a scene); *Belt v. Alabama Historical Comm'n*, 181 Fed. Appx. 763 (11th Cir. 2006) (minor changes in job duties, e.g. requiring reports be transmitted through supervisor and temporarily suspending authority to order inventory).

Unpleasant and undeserved though it may be, a supervisor's "yelling" or "fussing" is not an adverse employment action.   Title VII is not a general civility code.  *Oncale v. Sundowner Offshore Serv., Inc.* 523 U.S. 74, 80-81 (1998).   When an employee complains of "harassment" by a supervisor, that claim is actionable only if it rises to the level of a hostile work environment,

---

[28] Plaintiff's invocation of inadequate staffing  is clearly an "end around" move.  It was not asserted in the complaint and, based on the uncontroverted evidence, would not support a discrimination claim.  The pharmacy staff was reduced due to budgetary issues—a legitimate nondiscriminatory reason. By citing this evidence as the underlying basis for the purported adverse employment action, Amos is attempting to interject a claim that MCHD did not have an opportunity to challenge on summary judgment.

which requires "proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Amos has made no attempt to demonstrate that Stiegler's treatment of her rose to the level of a hostile work environment. Consequently, it cannot be considered an adverse employment action.

Amos' first two discrimination claims—scheduling absences and interviewing employees--also fall short for another reason. Amos is unable to identify a similarly-situated person outside the protected class who received more favorable treatment. "The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.' The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). Amos' comparison of her treatment to that of her predecessor, Phillip Brown, is unavailing. Amos was required to schedule and document leave in order to receive benefits related to an on-the-job injury. Brown had no such injury; therefore, the requirements were not applicable to him. While it is true that Brown interviewed pharmacy tech applicants and Amos did not, the circumstances were different. During Brown's tenure there were two pharmacists working in the Pharmacy at all times, so the Pharmacy was covered while Brown was involved in interviews. Amos was the only pharmacist when she became Pharmacy Director. If she left the Pharmacy to conduct interviews, the Pharmacy would have to be closed or a PRN pharmacist called in. Simply put, Brown is not a suitable comparator.

In sum, lacking support the for the discrimination claims she has pled, Amos has elected to proceed with misdirection and obfuscation. No hostile work environment claim has been asserted in this case; the evidence would not support it. Nevertheless, Amos spills much ink discussing her supervisor's verbal attacks. The other alleged acts of discriminatory treatment-- scheduling sick leave, not interviewing job applicants—are so inconsequential that Amos does not actually address their merit, instead diverting attention to other instances of alleged mistreatment. Amos has failed to prove a prima facie case of discrimination.

### Plaintiff's Retaliation Claims

Once again, the parties are not in agreement on the claims. In its summary judgment motion, MCHD has identified two retaliation claims asserted by Plaintiff. The first is Amos' claim that she was placed on paid administrative leave in response to her written complaint of race and sex discrimination. Second is the termination of Amos' contract as full-time Pharmacy director. In response, Plaintiff has identified a third claim—that she was not offered the part-time supervising pharmacist position filled by William Justice. The Court will assume, though only for the sake of argument, that Amos can demonstrate a prima facie case of retaliation[29] with respect to each of these claims. MCHD has proffered a legitimate nondiscriminatory reasons for each of its acts. Amos falls short in her attempt to discredit these reasons as pretext for discrimination.

---

[29] To prove a prima facie case of retaliation, a plaintiff must prove that she engaged in statutorily protected expression, that she suffered an adverse employment action and a causal link between the two. *Sullivan v. Nat'l R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999). MCHD does not contest Amos' ability to prove the two latter elements, but it does argue that Amos' expression was not statutorily protected because the acts objectively could not be considered discriminatory under Title VII.

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the Supreme

Court explained how the pretext element works:

> "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." . . . And in attempting to satisfy this burden, the plaintiff-once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision-must be afforded "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence."

*Id.* at 143 (quoting *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

To determine whether plaintiff's evidence of pretext is sufficient to create an issue of fact on

summary judgment, "the district court must evaluate whether the plaintiff has demonstrated 'such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy

of credence.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting

*Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3rd Cir. 1996)).

> *Administrative Leave with Pay*.

Amos was placed on administrative leave with pay while MCHD investigated her

complaint against Stiegler. MCHD avers that it did so for three reasons: (1) Amos' questionable

availability to perform her job as supervising pharmacist; (2) Amos' inability to work with

Stiegler, her supervisor and (3) Amos' inability to help with the Pharmacy's regulatory and

financial issues. Amos does not contest the truth of these reasons; rather, she argues that they are

pretext because they did not actually motivate MCHD. As proof that these were not the

motivating factors, Amos cites what she describes as the "dramatically" varying accounts of the

decision provided by Dr. Eichold, the decisionmaker. Dr. Eichold's reasons are set forth in a

declaration made under oath. Amos argues that this declaration is suspect because it differs from two other accounts provided by Dr. Eichold. The first is Dr. Eichold's April 22nd memo, but that does not purport to give the reasons for the suspension—only the terms and duration, i.e., "administrative leave with pay while the matter is being investigated." (Eichold Memo., Doc. 38-11.) Next, Amos quotes the following excerpt from Dr. Eichold's deposition testimony:

> And now that takes us down to the thought process of why I put her on paid leave was because of her—she had had problems with her supervisor, she was then having health problems and hadn't been at work now as a pharmacist for three days and that I needed time to try to sort this out and in order to control the key, Mr. Justice was made the supervising pharmacist.

(Eichold Dep., Doc. 38-9, 65-66.) Taking the last phrase--"in order to control the key, Mr. Justice was made supervising pharmacist"—Amos argues that this control of the pharmacy key is a separate, contradictory reason provided by Dr. Eichold. In an obvious attempt to manufacture contradiction where there is none, Amos takes two unrelated concepts—the reasons for placing her on leave and the reason for making Justice the supervising pharmacist—and twists them into one. Once Amos was placed on administrative leave, someone had to be in control of the pharmacy key. For that reason—control of the pharmacy key—Justice was made supervising pharmacist. The cited testimony is entirely *consistent* with MCHD's proffered reasons for placing Amos on administrative leave—unavailability and problems with her supervisor. Though he may have omitted one reason—Amos' inability to help with regulatory and financial issues--examined in context, Dr. Eichold was discussing a timeline of events, not purporting to state all the reasons for his decision.

> *Plaintiff's Termination as Full-Time Pharmacy Director*

MCHD offers three reasons for terminating Amos' contract: (1) the Pharmacy faced serious financial and regulatory issues; (2) Amos failed to recommend any meaningful course of

action in response to these issues; (3) In light of the decision to reduce the pharmacy services to part-time, it was not feasible to maintain a full-time Pharmacist. To dispute these reasons, Amos first cites Eichold's memo giving Amos 60 days' notice that her contract was being terminated "due to the restructuring of the inhouse pharmacy." (Pl's Ex. 33, Doc. 38-11.) That explanation is not at all inconsistent with Plaintiff's proffered reasons. It is uncontested that the Pharmacy was being restructured from full- to part-time for financial reasons. Next, Amos cites the reasons for termination given in MCHD's Response to Plaintiff's First Interrogatories. (Doc. 40-1, 12.) MCHD's response cites the financial and regulatory issues and the resulting reduction to part-time services as the basis for its decision. That answer is *consistent* with the proffered reasons. Nevertheless, because this response does not mention Amos' failure to assist (reason 2), Amos argues that it is evidence of pretext, though she does not elucidate. It is neither inconsistent nor contradictory to state an additional reason for termination that does not contradict or exclude other given reasons.

*Failure to Hire Amos for Part-Time Pharmacist Position*

MCHD asserts that it did not award Amos the position of part-time pharmacist for the simple reason that she did not apply. Amos argues that this reason is pretext for several reasons, none of which are persuasive. First, she argues that the position was already filled by William Justice. This is a red herring. In a one-pharmacist operation, the pharmacy cannot function with a vacancy. Consequently, the fact that a pharmacist is working does not contradict the assertion that a position is open. Moreover, Justice was hired due to exigent circumstances. MCHD was in a dire position. The pharmacy had been closed for two days. Amos was unavailable to work for an indeterminate period of time. In those circumstances, something had to be done to keep

the pharmacy functioning.  Justice's contract could be terminated with 60 days' notice.  Hence, his presence does not prove that the part-time pharmacist position was permanently filled.

Amos' next pretext argument is Dr. Eichold's "admi[ssion] that if Amos had not been put on leave, she *would have been involved in discussions* about remaining as interim supervising pharmacist."  (Pl's Brf., Doc. 39, 27.)  This is not an inconsistent position.  If Amos had applied, she also would have been involved in discussions about the supervising pharmacist position.  At deposition, the following hypothetical question was posed to Dr. Eichold:

> If she [Amos] had not been placed on . . . leave on the 22nd and the pharmacy decision was made to go from full time to part time, would she have remained employed as the part-time interim supervising pharmacist.

(Eichold Dep., Doc. 38-9, 94.)  Interestingly, Dr. Eichold *did not* agree that Plaintiff would have remained employed she had not been placed on leave.  He stated:  "I think we would have had that discussion with her because there's a significant reduction in pay. No benefits. . .  You don't qualify for life [and health] insurance. . .  So those would be topics that we would have discussed with her and if she responded to my June 27th letter, I think that Ms. Howat would talked to her [about being a part-time pharmacist]."  *Id.*  That Amos would have been "involved in discussions" does not mean that she would have become the part-time supervising pharmacist.[30]

Finally, Amos asks why she would be expected to "reapply" after her termination, especially when the position was already filled.  The answer is simple—because she was invited to do so.  MCHD sent Amos a letter inviting her to apply, although Amos never received it.  Because Dr. Eichold was the decisionmaker, it is his knowledge (not Amos') that is relevant in

---

[30] Amos implies, without specifically arguing the point, that the decision to place her on administrative leave directly caused her to lose the part-time position.  Amos never had the part-time position.  While she was on leave, her full-time position was terminated for legitimate nondiscriminatory reasons.

evaluating discriminatory intent.  *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253

1266 (11th Cir. 2010) (pretext centers on employer's beliefs, not employee's own

perceptions)(citing *Holifield v. Reno*, 115 F.3d 155, 1565 (11th Cir. 1997); *accord Nix v. WLCY*

*Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir.1984) (employment decision may be

"for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all" as

long as the reason is not discriminatory).  What Dr. Eichold knew is this--the letter was mailed to

Amos' home address and was not returned.  Therefore, he mistakenly believed that Amos knew

about the part-time position and did not apply.  Since she did not apply, he quite reasonably

assumed she was not interested in the position.[31]  An employer's decision not to award a position

to someone who has expressed no interest in it is a decision untainted by discriminatory intent.

**Conclusion**

In sum, Amos has failed to produce evidence from which a jury could find that MCHD

discriminated against her on account of her race or sex or retaliated against her for complaints

about discrimination.  Accordingly it is **ORDERED** that the Defendant's motion for summary

judgment be and hereby is **GRANTED**.

**DONE** and **ORDERED** this the 7th day of February, 2011.


                                        s/*Charles R. Butler, Jr.*
                                        **Senior United States District Judge**

---

[31] The position did, after all, involve a cut in pay and benefits.